SAYRE, JUDGE:
Claimants Mighty Mite Corporation and Franklin Grogg and Rhoda Grogg brought actions for property damage to their real property, which claimants allege occurred as a result of respondent’s negligent construction of a bridge. Mighty Mite Corporation’s (hereinafter referred to as Mighty Mite) property and the Groggs’ residence are adjacent to U.S. Route 35 in St. Albans, Kanawha County and are on either side of Tackett’s Creek, which flows beneath a bridge on U.S. Route 35. The present bridge on U.S. Route 35 is three lanes wide and was constructed by the Respondent in 1992, replacing a two-lane bridge that had been constructed in 1924. These claims were consolidated for hearing since they arose from the same occurrence. The Court is of the opinion to deny the consolidated claims for the reasons more fully stated below.
The incident giving rise to these claims occurred on May 28, 2004. A heavy rainfall occurred on that date which resulted in flooding in the basements of both properties. Gregory Humphreys, President of Mighty Mite, stated that he had purchased the Mighty Mite property in 1997 and that the only other time that that property had flooded since then was on November 18, 2003. Mr. Humphreys testified that the flooding at issue occurred on May 28, 2004 between 11:00 pm. and 12:00 midnight. He stated that he had been at home when the rain started but that he became worried about the possibility of the property flooding again. Mr. Humphreys drove to the property with a neighbor, James Cable. Mr. Cable testified that he and Mr. Humphreys arrived at the property around 11:00 p.m. and that the water was just rising to the level of Route 35. Mr. Humphreys was in the basement of Mighty Mite’s building trying to retrieve important documents, computer equipment, and other items to take these out of the building when the water started to flow into the building. He testified that there was approximately six feet of water in the basement when the flooding stopped. Mr. Humprheys stated that by midnight the level of Tackett’s Creek, which normally is about one foot deep, was up as high as approximately five feet on the upstream wall of the U.S. Route 35 bridge. Mr. Humprheys previously had built a three foot high wall between this property and Tackett’s Creek after the November 2003 flood and this wall extended to the right of way of U.S. Route 35. He testified that during the May 28, 2004 flood the water went over and around this wall. He stated that there was water on U.S. Route 35, but at its highest point it still did not flow all the way across the road. Mr. Flumphreys also had three storage buildings constructed on this property, each of which contained a number of storage units. There was approximately three or four feet of water inside these storage buildings. Mr. Humphreys testified that there was no flooding downstream from the bridge.
*87 The Grogg’s residence is located on the opposite side of the creek from the Mighty Mite property. Mr. Grogg testified that he and Rhoda Grogg, his wife, purchased the residence in 2002. He stated that on the night of the flooding incident herein, the water stayed in the creek bed until it rose to the bottom of the bridge. At that time, the water started flowing to either side of the creek bed onto his property and that of Mighty Mite. Mr. Grogg testified that his basement also flooded due to this incident, reaching as high as eight inches.
Samuel Wood, a Registered Professional Engineer, testified as an expert on behalf of the claimants. Mr. Wood initially came out to inspect the Mighty Mite building after the 2003 flood and he returned after the flood involved in this claim. Mr. Wood observed substantial foundation cracking on the Mighty Mite property, which was a direct result of flooding and flowing water pressure against the rear foundation of the building. After his first inspection, Mr. Wood had recommended that the block foundation wall of Mighty Mite’s building be reinforced to bring it into current structural standards. Mr. Wood stated that Mr. Humphreys had tried to deal with the damage by placing a retaining wall, but that this wall would have had to extend into the middle of U.S. Route 35 to have been effective. Mr. Wood testified that it appeared to him that the bridge on U.S. Route 35 had caused a back flow that resulted in flooding upstream of the bridge onto the area where claimants’ properties are located. He stated that the lack of adequate flow cross-sectional area under the bridge and the high outside curve elevation of U.S. Route 35 compounded to allow flooding of the properties. Mr. Wood testified that the orientation of the bridge, the super elevation of the road, and the fact that as a consequence the bridge deck surface was higher on the downstream side of the bridge, caused the water to back flow to the upstream side of the bridge flooding both Mr. Humphreys’ and Mr. Grogg’s properties. Mr. Wood stated that the water does flow through the opening under the bridge, but that the amount of flow through it was his main concern. He obseived that the bottom of the bridge was approximately three feet lower than the road elevation. Mr. Wood testified that according to the design plans for the bridge, the actual upstream side of the bridge was approximately 1.4 feet lower than the design specifications indicated. He stated that the opening of the bridge was therefore one hundred sixty square feet rather than two hundred nineteen square feet as would have been provided by the original design specifications. Mr. Wood stated that because the bridge as constructed was lowered and the open area is limited to one hundred sixty square feet, a restriction of that opening would allow for excess water to back-up and flow behind the bridge on the upstream side of the bridge. He testified that his main concern was with the elevation of the bridge in that it increased the resistance of the flow of water by lowering the opening and making the cross-sectional square footage smaller. Mr. Wood admitted on cross examination that, regardless of the elevation of the bridge, a greater amount of water is able to flow through the opening under the 1992 bridge than was able to flow through the opening under the 1924 bridge.
The position of the respondent is that the bridge constructed over Tackett’s Creek on U.S. Route 35 in 1992 met all the standards for such bridges at the time of its construction and that the bridge substantially improved the flooding situation in the area of the bridge. Respondent also contends that the regardless of whether the bridge is there or not, both claimants’ properties are in a flood plain area and will experience periodic flooding. Chet Burgess, County Highway Administrator for the respondent in Kanawha County, testified that on the date of the incident involved in these claims there had been no notice of high water near the bridge over Tackett’s Creek on U.S. Route 35. Mr. Burgess stated that there were crews out on the night of this flood for *88 high water, but that they were not in the area of Tackett’s Creek. He further stated that he was not aware of any instances of water over the road in this location.
Ray Lewis, a Registered Professional Engineer who is a staff engineer for Traffic Engineering with respondent, testified that he developed the project for the new bridge at Tackett’s Creek on U.S. Route 35. He stated that in developing his plan for the new bridge, he studied traffic conditions, traffic data, accident data, traffic counts, among other things, to try to come up with a plan to make the road operate as safely and efficiently as possible. Mr. Lewis stated that the old bridge was approximately twenty feet long with vertical abutments which are the concrete walls that support the bridge. He testified that this bridge included a 6% (six percent) super elevation due to the curvature of the road. Mr. Lewis stated that super elevation is the banking put on a curve which makes it easier for a driver to drive around a curve and keep a vehicle on the roadway. As part of this bridge replacement project, the designers decided to do a full bridge replacement with a larger structure. Mr. Lewis also testified that as part of the project there was a channel improvement, where the creek bed underneath the bridge was regraded and rip-rapped, which was done to ease the flow under the bridge and make the channel more efficient. He stated that file new bridge has a larger water way opening than the one that it replaced. The 1992 bridge has a thirty-five foot span.
Doug Kirk, an hydraulics engineer for respondent, prepared a report to determine whether or not the bridge over Tackett’s Creek on U.S. Route 35 met the standard of care for replacing the former bridge at the time the new bridge was constructed. Mr. Kirk testified that the new bridge is a three-lane bridge forty-eight feet wide with a free span of thirty-five feet. The free span of the 1924 bridge was approximately twenty feet wide. He testified that the super elevation of the bridge is six percent which is consistent with a forty miles-per-hour design speed. Mr. Kirk stated that super elevation should slope toward the inside of the curve with the outside of the curve being the high side and the inside of the curve being the low side. He testified that die only way the bridge could have been designed without super elevation would have been to straighten the road. Mr. Kirk further testified that U.S. Route 35 is a trunk line according to the West Virginia Division of Highways Drainage Manual, which means that the road should be serviceable for a fifty year storm. Also, according to the West Virginia Division of Highways Drainage Manual, the 1992 bridge should not cause additional back water as compared to the 1924 bridge. Mr. Kirk described back water as an increase in the water surface elevation upstream of any structure, whether it be a bridge or a wall built along the stream that affects upstream properties. M r. Kirk prepared a hydraulic analysis of the new bridge to compare with the old bridge. In doing so, he looked at cross sections of the stream, determining how deep and how wide the flood plains are, what obstructions are on the flood plain, the depth and span of the bridge and roadway approaches, and anything that would affect the flow of the water. Mr. Kirk stated that he looked at cross sections immediately upstream of the bridge because if the bridge were causing a problem, these areas would be the most severely affected. He further stated that he did comparisons of the new and the old bridge for ten, twenty-five, fifty, and one himdred year floods. In each of the floods, the new bridge would have lowered the water surface elevation as compared to that of the old bridge at sixty feet upstream of the bridge, the area that would most drastically affect claimants’ properties, for a ten, twenty-five, fifty, and one hundred year flood. Mr. Kirk testified that in his analysis the new bridge reduced the flooding in the area of the subject properties for each flood. According to his findings, the new bridge constructed by respondent lowered the water surface elevation which, in turn, *89 reduced any potential flooding to the property on the upstream side of the bridge. Thus, claimants’ properties were protected from flooding to a greater extent due to the construction of the new bridge.
On prior occasions, this Court has held that respondent may be held liable for the condition posed by a bridge. Malone vs. Division of Highways, 23 Ct. Cl. 216 (2000). Respondent has an obligation to construct bridges in such a manner as not to create a subsequent flood problem for nearby property owners. Daniels vs. Dept. of Highways, 16 Ct. Cl. 43 (1986).
However, in each of the prior opinions reviewed by this Court, where an award was made the bridge in question was erected at a site not previously spanned by a public roadway. Here the facts are otherwise. The reality is that not only West Virginia but every state has a substantial number of bridges constructed in 1924 or earlier. This Court is not prepared to hold that the respondent has either a legal or a moral obligation to replace all of those very old bridges that may create a damming effect or otherwise impede the free flow of water during a major flood. Given the fact that in many such cases the watershed upstream of the bridge is constantly being altered and “improved,” without any foreseeable relief from this kind of activity, such a ruling would make the State a moving target for property damage claims in this Court. A view of the site of the subject claims leads the Court to conclude that none of the structures belonging to the claimants herein in 2004 existed in 1924. What would be the liability of the State for these claims had the 1924 bridge not been replaced in 1992?
The question presented by these claims is rather: What obligation does the State have where, as here, the respondent in fact does replace one of these old bridges? We think that the respondent must construct such a replacement bridge in such a manner as not to create any new flood problems that did not exist before. Daniels vs. Dept. of Highways, Id.
The claimants make much of the fact that the replacement bridge was super elevated and could have been constructed so that the bridge was higher than it is, creating a larger upstream opening and thus allowing for a greater flow of water.
The 1924 bridge, like the 1992 bridge, was super elevated on the downstream side. This was in 1924 and in 2006 continues to be necessary, given the fact that U.S. Route 35 at the site of the bridge is in a curve and, in any case, we fail to see where the elevation of the downstream side of the bridge is material to the issues in the claims.
The open area under the upstream side of the 1924 bridge was 120 square feet. That opening under the 1992 bridge is 160 square feet. In addition, the creek bed underneath the bridge was regraded and rip-rapped in 1992, which was done to ease the flow of water under the bridge.
Further, the expert witness called by the claimants, Samuel Wood, conceded that the respondent had improved the flow of water that could pass under the bridge during flood conditions. Thus the facts presented indicate that the flooding of the claimant’s properties on May 28, 2004, would have been worse, not better, had the 1924 bridge been in place.
In accordance with these findings of fact and conclusions of law, the Court is of the opinion to and does deny these claims.
Claims disallowed.